1

2

3                    UNITED STATES DISTRICT COURT

4                  NORTHERN DISTRICT OF CALIFORNIA

5

6   JEANETTE MOLEX,                          Case No.: 11-cv-01282-YGR

7            Plaintiff,                       **ORDER GRANTING DEFENDANT'S MOTION
                                              FOR SUMMARY JUDGMENT**
8        vs.

9

10  CITY AND COUNTY OF SAN
    FRANCISCO,
11
             Defendant.
12

13

14          Plaintiff Jeanette Molex originally brought this employment discrimination claim in state court

15  on December 4, 2009.  (Dkt. No. 1.)  On March 1, 2011, Plaintiff filed a Second Amended Complaint

16  ("SAC") alleging an additional claim based on 42 U.S.C. section 1983 ("Section 1983 Claim" or

17  "Section 1983") for violation of her due process rights with respect to the termination of her

18  employment with the San Francisco Municipal Transportation Agency ("SFMTA" or "MTA").  *Id.*

19  Defendant City and County of San Francisco removed the action to federal court on March 16, 2011.

20  *Id.*

21          Defendant filed a Motion for Summary Judgment, or, in the Alternative, Summary

22  Adjudication of Issues on April 24, 2012.  (Dkt. No. 40 ("Motion" or "Mot.").)  On or about the date

23  the Motion was filed, Plaintiff requested that the Court dismiss her state law employment

24  discrimination claims.  (*See* Dkt. Nos. 39 & 47.)  The Motion is therefore being made as to the only

25  remaining claim against Defendant based on Section 1983.[1]  (Dkt. No. 45.)  On May 8, 2012, Plaintiff

26

27  _____

28  [1] Because there is only one operative claim, the Court will refer to the pending motion as the "Motion for
    Summary Judgment."

*United States District Court*
*Northern District of California*

United States District Court

Northern District of California

filed her Opposition to Defendant's Motion for Summary Judgment.  (Dkt. No. 53 ("Opposition" or "Opp.").)  Defendant filed its Reply in Support of its Motion for Summary Judgment on May 15, 2012.  (Dkt. No. 60 ("Reply").)

On May 29, 2012, the Court held oral argument on Defendant's Motion.  (Dkt. No. 71.)  In light of a magistrate's order requiring Defendant to produce a Rule 30(b)(6) deponent to testify regarding certain topics related to Plaintiff's Section 1983 Claim, the Court permitted Plaintiff to file a supplemental opposition to the Motion for Summary Judgment.  (Dkt. No. 81 ("Supp. Opp.").)  Defendant, in turn, filed a supplemental response on June 21, 2012.  (Dkt. No. 88 ("Supp. Reply").)[2]

As part of its Motion, Defendant filed a Request for Judicial Notice in Support of Motion for Summary Judgment (Dkt. No. 42) and Supplemental Request for Judicial Notice in Support of Motion for Summary Judgment (Dkt. No. 89).  The documents at issue consist of excerpts of: (i) the San Francisco Charter; (ii) San Francisco Civil Service Commission Rules; and (iii) San Francisco Administrative Code.  The Court **GRANTS** the Requests for Judicial Notice with respect the excerpts of the San Francisco Charter ("Charter").  *See* Fed. R. Evid. 201(b) (judicial notice may be taken of a fact "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  The Court further takes *sua sponte* judicial notice of other portions of the Charter, as addressed herein, which are directly relevant to the arguments raised by the parties.  The Court declines to take judicial notice of the Civil Service Commission Rules and Administrative Code section, as the Court does not rely on it in the resolution of this Motion.

The Court **STRIKES** Defendant City and County of San Francisco's Objections to Evidence Submitted by Plaintiff in Opposition to Defendant's Motion for Summary Judgment and Request for

---

[2] On May 3, 2012, Plaintiff filed an Ex Parte Motion to Defer Consideration or Deny Defendant's Motion for Summary Judgment Pursuant to Rule 56(d).  (Dkt. No. 47 ("Motion to Defer").)  In the Motion to Defer, Plaintiff contended that Defendant refused to produce certain information relevant to her remaining Section 1983 Claim and that such information was critical to opposing the Motion for Summary Judgment.  The Court referred the parties' discovery disputes Magistrate Judge Kandis A. Westmore on May 4, 2012.  (Dkt. No. 49.)  Judge Westmore ordered Defendant to provide certain requested discovery.  (Dkt. Nos. 65, 70 & 73.)  Having filed their supplemental briefs and with the parties having reviewed discovery relating to the primary issues underlying this Motion for Summary Judgment, the Motion to Defer is hereby **DENIED AS MOOT**.

United States District Court

Northern District of California

1    Consideration of Objections (Dkt. No. 64) for failure to comply with Civil Local Rule 7-3.  The Local

2    Rule requires that "[a]ny evidentiary and procedural objections to the opposition must be contained

3    within the reply brief or memorandum."  Civ. L.R. 7-3(c).  As such, the Court will not respond to the

4    objections raised therein, but nonetheless considers only relevant, admissible evidence.

5          Having carefully considered the papers submitted and the pleadings in this action, and for the

6    reasons set forth below, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment.

7    **I.       FACTUAL AND PROCEDURAL BACKGROUND**

8          Beginning in 2004, Plaintiff Jeanette Molex worked as a Transit Officer (Civil Service Class

9    9163) with the SFMTA, formerly the Municipal Railway Agency ("Muni").[3]  Reply SS at no. 1.

10   Plaintiff drove historic streetcars on the F-Line for Muni.  *Id.* at no. 2.  On August 4, 2008, Plaintiff

11   was involved in an accident as she drove a historic streetcar train near the Ferry Building.  *Id.* at nos.

12   3–5.  Plaintiff's car went through a red light and hit another historic streetcar, which Plaintiff explains

13   occurred because hers experienced brake failure (the "Incident").  *Id.* at no. 4.  Just prior to the

14   Incident, Plaintiff and the operator of the other car had switched cars, and Plaintiff had been instructed

15   to follow the other car.   Deposition of Jeanette Molex ("Molex Dep. (July 29, 2010)") (Dkt. No. 40-

16   1) 113:5–114:1, 114:23–115:2 & 116:17–117:1, attached as Ex. A to the Declaration of Ruth M. Bond

17   in Support of Defendant City and County of San Francisco's Motion for Summary Judgment ("Bond

18   Decl.").  Both streetcar operators were transported to the hospital, in addition to other passengers.

19   Reply SS at no. 6; Molex Dep. (July 29, 2010) 146:17–22, 147:24–148:6 & 148:18–20.  Repairs to

20   the two streetcars have been estimated to cost over $132,000.  Reply SS at no. 7.

21         **Preliminary Review of Plaintiff's Actions:**  Three days after the Incident, on August 7, 2008,

22   Sarita Britt (Acting Superintendent of Plaintiff's division) sent Plaintiff a letter with the subject line:

23   "**PROPOSED RECOMMENDED DISCIPLINARY ACTION – Dismissal**."  Reply SS at no. 8;

24   Declaration of Sarita Britt in Support of Defendant City and County of San Francisco's Motion for

25   Summary Judgment ("Britt Decl.") (Dkt. No. 40-7), Ex. B (emphasis in original).  The letter set forth

26   Britt's recommendation that Plaintiff be terminated from her position as a transit operator and

27

28   [3] Defendant City and County of San Francisco's Reply to Plaintiff's Separate Statement of Undisputed Material
     Facts in Support of Motion for Summary Judgment ("Reply SS") (Dkt. No. 59) at no. 1.  Unless otherwise
     noted, the references to the material fact nos. include the evidence supporting the same.

outlined the basis for the charges, including the August 4, 2008 Incident, in which Plaintiff's streetcar on the F-Line made contact with another car "causing damage to equipment and injuries to our patrons." Britt Decl., Ex. B. Britt stated that the "basis for the recommendation was that a "[t]rain operating on surface tracks must maintain a distance of at least 250 feet from the preceding train" and provided a list of rules that Molex had allegedly violated. *Id.*; Reply SS at no. 11. Molex was informed that she had a "right to provide a response to th[e] proposed recommended action," either written or oral, and that a "Skelly meeting" would be scheduled for August 13, 2008. Britt Decl., Ex. B (hereinafter, "Skelly Notice").[4]

**First Review of Recommendation to Terminate:** The process afforded Plaintiff to challenge the recommended disciplinary action was detailed in a negotiated "Memorandum of Understanding Between San Francisco Municipal Transportation Agency Municipal Railway (Muni) and Transport Workers' Union, Local 250–A (9163)."[5] Eight days after Britt's letter, on August 15th, Plaintiff attended the Skelly meeting with the Chairman of her Union. Reply SS at nos. 12–13; Declaration of Frank Lum in Support of Defendant City and County of San Francisco's Motion for Summary Judgment (Dkt. No. 40-3 ("Lum Decl.")) ¶ 9, attached as Ex. D to the Bond Decl. Frank Lum served as the Skelly officer. Lum Decl. ¶ 5. At the time of the hearing, Lum was the Superintendent of Municipal Railway Operations and in that capacity "supervised various aspects of [] streetcar operations." *Id.* ¶ 1. Moreover, he had personally supervised the operations of the "F" Line streetcars, which was the line at issue. *Id.*

---

[4] The California Supreme Court has held that due process demands that permanent public employees be afforded adequate pre-removal safeguards prior to punitive action against them in order to "minimize the risk of error in the initial removal decision." *Skelly v. State Pers. Bd.,* 15 Cal. 3d 194, 215 (1975) ("As a minimum, these pre[-]removal safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline.").

[5] The Court will refer to Plaintiff's union, Transport Workers' Union, Local 250–A, as the "Union." The Court will further refer to the Memorandum of Understanding Between the MTA (Muni) and the Union, as amended effective July 1, 2008, as the "MOU." *See* Ex. 5 to the Deposition of Person Most Knowledgeable Debra Johnson (Dkt. Nos. 40-5–40-6 ("Johnson Dep. (Jan. 25, 2011)") (complete MOU), attached as Ex. E to Bond Decl.; *see also* Ex. A to the Declaration of Mike Helms in Support of Defendant City and County of San Francisco's Motion for Summary Judgment (Dkt. No. 40-8 ("Helms Decl.")) (excerpts of MOU).

At the Skelly meeting, Plaintiff explained to Lum her version of what occurred on the date of the collision, including that she attempted to stop, but that the brakes had failed.  Reply SS at no. 13; Lum Decl. ¶ 10; Declaration of Jeanette Molex in Opposition to Motion for Summary Judgment ("Molex Decl.") (Dkt. No. 55) ¶ 7; *see* Deposition of Jeanette Molex ("Molex Dep. (Vol. II, Sept. 2, 2010)") 245:5–22, attached as Ex. B to Bond Decl.  Lum also considered her written report and the report of an Inspector from the Mobile Response Unit.  Lum Decl. ¶ 8.  On August 15, 2008, the same day as the hearing, Lum sustained the termination recommendation based on the evidence presented.  Reply SS at no. 14; Lum Decl., Ex. B.  Lum communicated the decision in a short 2-page letter which stated that the decision was "[b]ased on the facts and [] listening to Operator Molex's statements."  Lum Decl., Ex. B.  It further advised Plaintiff that she could appeal "in accordance with Article 27" of the MOU.  *Id.*  On that same day, August 15, Plaintiff immediately filed an appeal and request for an Accident Review Board hearing ("ARB" or "ARB Hearing").  Britt Decl., Ex. C.

**Second Review of Recommendation to Terminate:**  The purpose of the ARB Hearing is to determine whether collisions involving Muni operators are deemed avoidable or unavoidable, *i.e.* whether the operator contributed to the cause of the accident.  Reply SS at no. 17.   The ARB consists of three panel members.  Helms Decl. ¶ 11.  Each of the MOU's participants selects a representative and/or a neutral to create balance:  one by the Union, one by the MTA, and an agreed-upon neutral not affiliated with either.  *Id.*  Under the MOU, the ARB Hearing "shall be completed within 20 business days of the date the appeal is filed."  MOU § 23.6 at 286; Helms Decl. ¶ 11.  Waiver of the deadline could be made by the MTA, Union or employee.  MOU § 23.6 at 293.  "All testimony before the ARB [would] be sworn and only information relevant to the facts of the accident [would] be admissible."  MOU § 23.6 at 289.  Further, a party could request a transcript.  *Id.*

Here, the ARB consisted of panel members in conformity with the MOU.  Declaration of Paul Petersen in Support of Defendant City and County of San Francisco's Motion for Summary Judgment. (Dkt. No. 40-10 ("Petersen Decl.")) ¶ 4.  Twenty business days after August 15, 2008 (not including Labor Day) is September 15, 2008.  The ARB Hearing was held on October 17, 2008.  Reply SS at no. 18.  Plaintiff states that she did not waive the deadline nor did she instruct her Union to waive it.  Molex Decl. ¶¶ 20–21 (stating, however, that she did not agree that the ARB Hearing may be

United States District Court

Northern District of California

5

"completed beyond September 5, 2012" [*sic*]).  Neither party provides the Court with an explanation for the timing of the ARB Hearing or whether the SFMTA or the Union requested additional time.[6]  However, the Court notes that the brake test to determine whether the brakes had functioned did not occur until September 29, 2008.  Deposition of Karl Johnson ("K. Johnson Dep.") 57:12–23, attached as Ex. D (Dkt. No. 60-1) to the Bond Reply Decl.

Britt presented the case on behalf of the SFMTA at the ARB Hearing.  Britt Decl. ¶ 17.  At least two Union representatives accompanied Plaintiff at the ARB Hearing.  Molex Dep. (Vol. II, Sept. 2, 2010) 259:7–260:8.  With Plaintiff and her Union representatives present, the ARB reviewed and discussed "every little detail, step by step, of . . . everything that happened, and if what [Molex] did was what [she] was supposed to do or not," including drawing details of the Incident on a white board.  *Id.* 257:23–258:8, 260:9–12 & 260:24–261:4.  Plaintiff's representatives not only gave a presentation, but Plaintiff also had an opportunity to speak at the ARB Hearing (although she does not recall saying anything other than she wanted to keep her job).  *Id.* 258:9–15 & 260:13–23; Reply SS at no. 19.  The ARB specifically considered Plaintiff's claim that the brakes had failed and the results of the brake test which indicated the brakes were not defective.  Petersen Decl. ¶ 5 & Ex. A thereto.  The ARB determined that "[r]egardless of whether the brakes failed," Plaintiff had violated the spacing rule and that the accident was avoidable.  *Id.* ¶ 6.

The record before this Court does not include the transcript of the proceedings or any written record of the ARB's express findings, only one ARB member's recollection.  *See* Reply SS at nos. 20–21; Petersen Decl. ¶¶ 5–6.  Plaintiff's Union representative notified her that the ARB reached a decision and that she could challenge the recommended dismissal at the "Step 3" level.  Molex Dep. (Vol. II, Sept. 2, 2010) 261:15–22 & 288:12–19; Molex Decl. ¶ 12; Reply SS at no. 22.

**Third Review of Recommendation to Terminate:**  Plaintiff's Union filed a "Step 3" grievance on her behalf challenging the recommended dismissal.  Reply SS at no. 22; MOU § 23.6 at 291.  Here, Mike Helms, the Labor Relations Manager assigned to the SFMTA, served as the Step 3

United States District Court

Northern District of California

---

[6] Paul Petersen testified that the twenty-day timing between an ARB hearing and date of appeal was "rarely adhered to" and was often waived between the union and management.  Deposition of Paul Petersen ("Petersen Dep.") 80:10–81:3, attached as Ex. A (Dkt. No. 60-1) to the Reply Declaration of Ruth M. Bond in Support of Defendant City and County of San Francisco's Motion for Summary Judgment ("Bond Reply Decl.").

Grievance Hearing Officer.  Helms Decl. ¶¶ 1 & 12.  In his then-relevant capacity, Helms met and conferred with various unions, participated in contract negotiations, resolved problems between management and staff, advised on and investigated disciplinary matters, served as a "Step 3" hearing officer and represented the department in arbitrations.  *Id.* ¶ 5.

Helms reviewed relevant documents and held the Step 3 hearing on November 26, 2008.  Reply SS at no. 23; Helms Decl. ¶¶ 13–16. Helms listened to the Union's and MTA's respective positions and arguments.  Reply SS at nos. 24 & 25.  The issues before Helms were: (i) whether Plaintiff had violated the rules as stated in the Skelly Notice; (ii) whether such violations, if found, warranted dismissal; and (iii) whether discipline had been applied in a timely fashion.  Helms Decl. ¶ 14.  The Union argued that: (i) the proposed discipline was untimely; (ii) did not follow the doctrine of progressive discipline; (iii) plaintiff was not provided sufficient warning about proper spacing; and (iv) plaintiff was an outstanding operator.  Helms Decl. ¶ 15 & Ex. D; *see* Molex Dep. (Vol. II, Sept. 2, 2010) 300:23–301:19.  The MTA countered that the grievance should be denied because Plaintiff had violated the rules as written in Lum's Skelly decision and because Plaintiff operated a car that made contact with another, causing damage and injury.  Helms Decl., Ex. D.  Those present included Plaintiff, the Union's Chairperson, the Union's Executive Vice-President, Britt, and two personnel analysts from the MTA.  *Id.*

In a two-page letter dated December 9, 2008, Helms outlined each party's position.  The letter did not explicitly resolve each of the Union's arguments.  It summarily stated that he "determined the grievance before the hearing officer was presented in a timely fashion."  Helms Decl., Ex. D.  Helms determined that Plaintiff "did violate all rules as stated in the August 15, 2008, Skelly decision letter from Frank Lum."   Reply SS at no. 26; Helms Decl. ¶¶ 16–17 & Ex. D.  Helms denied the grievance and notified Plaintiff that "[i]t is the Agency's decision to terminate your employment."  Helms Decl., Ex. D; Reply SS at nos. 26–27.  The letter also stated that the Union or Plaintiff may appeal the Step 3 decision to an impartial hearing officer as set forth in the MOU.  Helms Decl., Ex. D.

The Union moved the grievance to a non-binding neutral arbitration (Step 4) pursuant to the MOU, which stated that the hearing officer would prepare a report "contain[ing] a factual summary of the grievance or grievances, the evidence, and his/her decision.  The SFMTA Executive Director/CEO

United States District Court
Northern District of California

or his/her designee shall exercise his/her discretion in accepting, modifying or rejecting the recommended decision."  Reply SS at nos. 28–29; MOU Art. 27 at 327.  Alexander Cohn served as the arbitrator and held a hearing on February 24, 2009.  Reply SS at no. 30.  Plaintiff and her Union representatives attended and Plaintiff testified.  *Id.* at no. 31; Molex Dep. (Vol. II, Sept. 2, 2010) 304:20–305:7 (Plaintiff stated she expressed remorse regarding the accident, had no control over what happened, wanted to keep her job, and was willing to accept whatever discipline the arbitrator had to offer).

Cohn issued a two-page decision on February 26, 2009 ("Arbitrator's Non-Binding Decision").  Ex. K (Dkt. No. 53-1) to the Declaration of Dow W. Patten in Opposition to Motion for Summary Judgment ("Patten Decl.").  The "Abbreviated Facts" section included a notation that the ARB considered that Plaintiff had had a "prior Avoidable accident" but the MTA did not have proof of the same.  *Id.*  The arbitrator did not provide the basis for this conclusion.  He also began his "Abbreviated Opinion" with the standard he applied in these cases:

> As the Step 4 Hearing Officer has noted in many prior cases, the just cause standard favors progressive discipline which affords the employee an opportunity to modify behavior before more serious discipline, up to and including discharge, is imposed. However, progressive discipline concepts do not apply in the face of proven gross misconduct which warrants summary discharge in the first instance.

*Id.*  Cohn continued that "the accident at issue was particularly serious, given the personal injury and property damage."  *Id.*  He also stated that in cases where an accident is "found [to be] Avoidable, management has the right to factor in such resulting injuries and/or property damage when determining the appropriate penalty."  *Id.*  However, Cohn based his decision on certain mitigating circumstances in Plaintiff's case, such as management's "incorrect belie[f]" that Plaintiff had an avoidable accident in 2007 and Plaintiff's "sincere remorse."  *Id.*  In his view, these two factors made the penalty of dismissal "excessive under the totality of the facts and circumstances."  *Id.*  Notably, the decision does not indicate any other concerns regarding the underlying facts of the Incident itself. Cohn determined that Plaintiff was not discharged for good cause and recommended that she: (i) be conditionally reinstated; (ii) suspended for thirty days; (iii) permanently removed from rail operations work; and (iv) be subject to a last chance agreement.  *Id.*; Reply SS at no. 34.

1    The MOU provided Nathaniel Ford, as the Executive Director and Chief Executive Officer of

2 the MTA, or his designee with discretion to "accept[], modify[] or reject[] the recommended

3 decision"—here, the Arbitrator's Non-Binding Decision.  MOU Art. 27 at 327; Declaration of

4 Nathaniel P. Ford in Support of Defendant's Motion for Summary Judgment (Dkt. No. 41-1 ("Ford

5 Decl.")) ¶¶ 2–3.  Debra Johnson, as Director of Administration, Taxis, and Accessible Services for the

6 MTA, was responsible for, among other things, reviewing recommendations for discipline of MTA

7 employees and approving recommended discipline.  Declaration of Debra Johnson in Support of

8 Defendant City and County of San Francisco's Motion for Summary Judgment (Dkt. No. 40-9

9 ("Johnson Decl.")) ¶ 5.)

10    Johnson reviewed the Arbitrator's Non-Binding Decision and consulted with Labor Relations

11 staff.  Johnson Decl. ¶ 10; Reply SS at no. 35.  Notably, the department had, effectively, a "zero

12 tolerance policy" for what the MTA viewed as serious accidents.  Johnson Dep. (Jan. 25, 2011) 30:6–

13 11.  She consulted with Ford and recommended that he modify the Arbitrator's Non-Binding

14 Decision.  Johnson Decl. ¶ 10; Johnson Dep. (Jan. 25, 2011) 21:1–19;  Ford Decl. ¶ 4.  Johnson based

15 her recommendation on the seriousness of the accident, the amount of damage caused to the transit

16 vehicles, and the number of customers injured.  Johnson Decl. ¶ 10; Johnson Dep. (Jan. 25, 2011)

17 27:21–28:13, 48:5–50:17 & MOU (attached as Ex. 5 to Johnson Dep.); see Ford Decl. ¶ 4.  Johnson

18 believed that the August 4, 2008 accident qualified as a "serious" accident under the MOU section

19 23.6 at 282 and Appendix F to the MOU, which provided examples of serious accidents.  Johnson

20 Dep. (Jan. 25, 2011) 48:5–50:17 & MOU (attached as Ex. 5 to Johnson Dep.).  In addition, Johnson

21 believed that the Arbitrator had "mistakenly concluded" that the MTA's recommended dismissal was

22 based on a prior avoidable accident of Plaintiff's.  Johnson Decl. ¶ 10; Ford Decl. ¶ 4.  Johnson

23 recommended that additional restrictions be placed on Plaintiff's future employment with MTA.

24 Johnson Decl. ¶ 11; Johnson Dep. (Jan. 25, 2011) 57:6–58:3; see Ford Decl. ¶ 5.

25    Ford reviewed and agreed with Johnson's recommendation to modify the Arbitrator's Non-

26 Binding Decision.  Ford Decl. ¶¶ 4, 6 & Ex. A.  Between 2008 and 2010, Ford modified five non-

27 binding arbitration decisions all of which Cohn authored.  Confidential Deposition of Person Most

28 Knowledgeable Debra A. Johnson ("Johnson Dep. (June 6, 2012)") 98:19–23, attached as Ex. A to the

1   Declaration of Ruth M. Bond in Support of Defendant City and County of San Francisco's

2   Supplemental Memorandum (Dkt. No. 92 ("Bond Supp. Decl.")) and as Ex. A to the Declaration of

3   Dow W. Patten in Response to Order Dated July 3, 2012 (Dkt. No. 94 ("Patten Supp. Decl.")).   Cohn

4   is not the only arbitrator used to conduct non-binding arbitrations for the Union and MTA.  *Id.* 98:15-

5   18.

6        By letter dated April 24, 2009, the MTA dismissed Plaintiff from her position as a transit

7   officer and informed her that future restrictions were being placed on her employment with the MTA.

8   Reply SS at nos. 40–41; Johnson Decl., Ex. B.  The signature block on the letter read: "Reviewed and

9   Approved by Nathaniel P. Ford, Sr. Executive Director/CEO."  However, Johnson herself signed on

10  the signature line and noted the word "for" in front of "Nathaniel."  Johnson Decl., Ex. B.  The Notice

11  of Separation from Employment (enclosed with the letter) stated that: "You may request a hearing

12  before the Civil Service Commission on your future employability with the civil service system of the

13  City and County of San Francisco.  The Civil Service Commission has the authority to remove

14  restrictions or impose additional restrictions on your future employability.  However, the Commission

15  <u>CANNOT</u> reverse the department's decision to terminate your employment." *Id.* (emphasis in

16  original).

17       Plaintiff filed an appeal with the Civil Service Commission ("CSC") seeking a review of the

18  employment restrictions.  Reply SS at no. 44.  The CSC held a meeting on December 7, 2009 to

19  decide whether to approve the recommended restrictions, which Plaintiff and her counsel attended.

20  *Id.* at no. 45.  The CSC voted five to zero to cancel Plaintiff's examination or eligibility status and

21  prohibit her from holding future employment with the MTA in a position that requires a Class B or

22  BP's driver's license.  *Id.* at no. 46.  The CSC notified Plaintiff of this decision in a letter dated

23  December 9, 2009.  *Id.* at no. 47.

24       In December 2009, Plaintiff filed suit in state court alleging discrimination.  Over a year later,

25  in March 2011, she added a claim to allege a due process violation stemming from alleged City

26  policies of inadequately investigating Muni accidents, exhibiting deliberate indifference to

27  constitutional rights of employees, and failing to "provide all information upon which employment

28  decisions would be based in front of the regular employment arbitration process."  SAC ¶¶ 43–44.

Specifically, Plaintiff claimed that Johnson had violated the Constitution by withholding an "eyewitness account[]" of Plaintiff's driving on the day of the Incident (but not the Incident itself). *Id.* ¶ 44; *see also id.* ¶ 45.[7]  In opposition to this Motion, Plaintiff asserts that the process of challenging employee discipline lacked safeguards to protect employees' due process rights.  In particular, Plaintiff challenges the decision to "modify" the Arbitrator's Non-Binding Decision, such that her employment was terminated.

## II.   DISCUSSION

### A.   Legal Standard for Motion for Summary Judgment Under Fed. R. Civ. P. 56

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Id.* at 247–48 (dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 994 (9th Cir. 2007).  On an issue where the non-moving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case.  *Celotex*, 477 U.S. at 324–25.  If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion.  *Anderson*, 477 U.S. at 250.  The opposing party's evidence must be more than "merely colorable" but must be "significantly probative."  *Id.* at 249–50.  Further, that party may not rest upon mere allegations or denials of the

---

[7]  The new allegations did not refer to any timeliness concerns.

United States District Court
Northern District of California

1  adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine

2  issue of material fact for trial. *Nissan Fire & Marine Ins. Co.*, 210 F.3d 1099, 1102 (9th Cir. 2000);

3  *Nelson v. Pima Cmty. Coll. Dist.*, 83 F.3d 1075, 1081–1082 (9th Cir. 1995) ("mere allegation and

4  speculation do not create a factual dispute"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d

5  912, 922 (9th Cir. 2001) ("conclusory allegations unsupported by factual data are insufficient to

6  defeat [defendants'] summary judgment motion").

7       When deciding a summary judgment motion, a court must view the evidence in the light most

8  favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S.

9  at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709–10 (9th Cir. 2011). However, in determining

10  whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a

11  genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal

12  quotations omitted). Rather, a court is entitled to rely on the non-moving party to identify with

13  reasonable particularity the evidence that precludes summary judgment. *See id.*; *Carmen v. San

14  Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not

15  examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set

16  forth in the opposing papers with adequate references so that it could conveniently be found.")

17       **B.    Standard for Municipal Liability Based on *Monell v. Dep't of Social Servs.***

18       In *Monell v. Dep't of Social Servs.*, the Supreme Court held that local governments are

19  "persons" under Section 1983 subject to liability for damages where "action pursuant to official

20  municipal policy of some nature cause[s] a constitutional tort." 436 U.S. 658, 691 (1978). Under

21  Section 1983:

22          Every person who, under color of any statute, ordinance, regulation, custom, or usage,
           of any State or Territory or the District of Columbia, subjects, or causes to be
23          subjected, any citizen of the United States or other person within the jurisdiction
           thereof to the deprivation of any rights, privileges, or immunities secured by the
24          Constitution and laws, shall be liable to the party injured in an action at law, suit in
           equity, or other proper proceeding for redress.
25

26  Although a city may not be held vicariously liable for the unconstitutional acts of its employees on the

27  basis of an employer-employee relationship with the tortfeasor, it may be held liable under *Monell*

28  when a municipal policy or custom *causes an employee* to violate another's constitutional right. 436

U.S. at 691–92.  In order to hold a municipality liable, a plaintiff must show that: (1) he or she possessed a constitutional right of which he or she was deprived; (2) the city had a policy; (3) said policy amounted to deliberate indifference to his or her constitutional rights; and (4) such policy was the moving force behind the constitutional violation.  *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997); *Zografos v. City and County of San Francisco*, C 05-3881 PJH, 2006 WL 3699552, at *14 (N.D. Cal. Dec. 13, 2006).

A plaintiff may establish municipal liability under Section 1983 in one of three ways.  First, the plaintiff may show that an employee committed a constitutional violation pursuant to an expressly-adopted official policy or to a "longstanding practice or custom which constitutes the 'standard operated procedure' of the local government entity."  *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  Second, the plaintiff may establish that the employee committing the constitutional violation was an official with "final policy-making authority" and "that the challenged action itself thus constituted an act of official government policy."  *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).  Here, the "edicts or acts may fairly be said to represent official policy" in the area of the decision made.  *Ulrich*, 308 F.3d at 985 (internal citations omitted).  Third, a plaintiff may prove that an official with policy-making authority "ratified a subordinate's unconstitutional decision or action and the basis for it" (*Gillette*, 979 F.2d at 1346–47) or that the official delegated that authority to the subordinate (*Ulrich*, 308 F.3d at 985).

**C.    Application of *Monell* to Plaintiff's Termination**

To determine whether Plaintiff has any triable claim under a *Monell* theory, the Court reviews each of the avenues for holding the municipality potentially liable.  Defendant argues that Plaintiff cannot establish her Section 1983 Claim under any theory and that she has not shown any of the procedures followed by the MTA amounted to an unconstitutional policy that denied Plaintiff or other employees of due process.  Mot. at 1; Supp. Reply at 1.

**1.    Long-Standing Policy**

First, a *Monell* claim may exist when the constitutional violation results from an expressly-adopted official policy or a "longstanding practice or custom which constitutes the 'standard operated

United States District Court
Northern District of California

procedure' of the local government entity." *Ulrich*, 308 F.3d at 984.  Liability for a longstanding practice or custom "may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (quoting *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *Gillette*, 979 F.2d at 1349 (it is crucial to the inquiry that plaintiff establish "how long this alleged informal policy existed").

At oral argument, Plaintiff's counsel admitted that—based on the initial Opposition and the evidence contained therein—insufficient evidence of a long-standing policy under *Monell* existed. The Court permitted supplemental briefing on the Motion limited to the issue of a policy or long-standing practice and based upon the additional deposition evidence which remained outstanding. (Dkt. No. 71.)  Plaintiff now argues the existence of a long-standing practice of modifying non-binding arbitration decisions denies employees due process.  Supp. Opp. at 2.[8]  Plaintiff's evidence of this "policy" consists of Ford modifying a total of five non-binding arbitration decisions (including Plaintiff's) by overturning one particular arbitrator's recommendation to impose either no discipline or some form of discipline less than termination.  Supp. Opp. at 3; Patten Supp. Decl., Exs. C–J; *see also* Dkt. No. 81-1.  In a sixth case, the modification was favorable to the employee.  Because Ford exercised his discretion to modify the five decisions and his decisions were final, Plaintiff concludes that these "employees had no post-deprivation process provided to them" and their due process rights are not adequately protected.  Supp. Opp. at 3–4.

The Court is not persuaded.  First, the record does not support a finding of a long-standing practice of modifying non-binding arbitration decisions.  At most, the Plaintiff has identified five instances each with unique characteristics and each arising from the particular arbitrator's point of

---

[8] The Court notes that Plaintiff changed her position between her initial and Supplemental Opposition briefs. In her initial Opposition, Plaintiff repeatedly argued that Johnson—not Ford—made the decision to overturn the Arbitrator's Non-Binding Decision.  Mot. at 9 & 12 ("the decision of Debra Johnson to disregard the arbitrator's findings is an unreviewable decision"); Reply SS at nos. 36–39 ("**DISPUTED**.  Johnson terminated Molex's employment, not Nathaniel Ford.") (emphasis in original).  Plaintiff now seems to have abandoned that argument in favor of asserting that Ford is the final policymaking authority, but that he delegated his authority to Johnson or that he ratified her unconstitutional decision.

view.[9]  Plaintiff herself admits that the arbitrator's decisions were "variously" based on differing

rationales.  Supp. Opp. at 4 n.1.  Johnson testified that she was not aware that Ford modified any

arbitration decisions in 2008.  Johnson Dep. 86:6–20.  In 2009, Ford modified three decisions but

Johnson only recommended two of the three modifications.  *Id.* 86:21–87:12 & 89:7–9.  In 2010, Ford

modified two other arbitration decisions without any input from Johnson.  *Id.* 87:13–15 & 89:10–12.

The Court may infer that Ford ultimately disagreed with the reasons that the arbitrator found

persuasive in making his own decision, but no more.[10]  Plaintiff has not presented even a colorable

showing of a long-standing practice of arbitrary and routine modifications of non-binding arbitration

_____

[9] Employee 1 (Patten Supp. Decl., Exs. C & D):  Cohn recommended that grievant not be dismissed, but that a seven-day disciplinary suspension be imposed.  The original recommendation to dismiss was based on grievant's violation of rules concerning inattention of duties, respectful behavior, failure to call out stops, and a history of past rule violations.  Cohn's recommendation was based on his belief that a particular customer complaint was hearsay in nature.  Cohn did find, however, that other complaints regarding the grievant were accurate and that some discipline was warranted.  Ford overturned Cohn's decision because he agreed with the original recommendation to dismiss.  Johnson testified that she made no recommendation to arbitration decisions in 2010.  Johnson Dep. (June 6, 2012) 89:10–12 & 89:19–25.

Employee 2 (Patten Supp. Decl., Exs. E & F):  Cohn recommended that grievant be reinstated because a Skelly decision was not issued within fourteen days after the hearing.  The original recommendation to dismiss was based on an accident in which the grievant's coach hit a bicyclist, who was killed.  A video of the incident indicated that grievant sped up, rather than slowing down, prior to hitting the bicyclist.  Ford overturned the arbitrator's decision based on the "egregious nature of this accident."  Johnson signed the letter overturning the arbitrator's recommendation on behalf of Ford.  Johnson Dep. (June 6, 2012) 92:23–93:11.

Employee 3 (Patten Supp. Decl., Exs. G & H):  Cohn recommended no discipline based on the facts and circumstances where a pedestrian was killed and a related investigation by the CPUC revealed that grievant had received a high volume of text messages during his shift.  Cohn found grievant's explanation—that his son had his cell phone during the shift—credible and that it was unlikely grievant had his phone with him.  Ford "vehemently disagree[d]" and found that grievant had blatantly disregarded safety rules, which had "catastrophic results."  Johnson did not sign the letter overturning the arbitrator's recommendation, although she did sign on the Step 3 notice.  Johnson Dep. (June 6, 2012) 97:5–23.

Employee 4 (Patten Supp. Decl., Exs. I & J): Cohn recommended a ten-day suspension to grievant, who had previously tested positive for drugs, was allowed to keep his job subject to a last chance agreement, and then was unable to give a urine sample at a later drug test (which the MTA believed was a refusal to submit to testing).  Ford disagreed with the arbitrator's decision and dismissed the employee for failure to comply with rules prohibiting drugs.  *See* Johnson Dep. (June 6, 2012) 89:10–12 & 94:1–14.

[10] To the extent that Plaintiff implies some kind of bias against Cohn's decisions that has resulted in intentional deprivations of due process, Plaintiff provides no evidence upon which such an inference can be drawn. Supp. Opp. at 3–4.

United States District Court

Northern District of California

United States District Court

Northern District of California

1   decisions.

2          Second, and more fundamentally, the written grievance process of which Plaintiff complains,

3   *i.e.* Ford's authority to accept, modify or reject, stems from the MOU itself, which the Union

4   negotiated.   Pursuant to the MOU's grievance procedure for disciplinary actions, employees are

5   entitled to a Skelly hearing and: (i) a notice of the proposed action; (ii) the reasons for the proposed

6   discipline; (iii) a copy of the charges and materials upon which the action is based; and (iv) the right

7   to respond, either orally or in writing, to the authority initially bringing charges.  MOU § 23.1 at 247.

8   From the beginning of the process, the Union accompanied the Plaintiff.  *See* Lum Decl., Ex. B.  For

9   "serious or major accidents," an employee charged with an accident may appeal that decision to the

10  Accident Review Board.  MOU § 23.6 at 284.  The ARB consisted of both Union and MTA panelists

11  to ensure a fair process.  Further, the ARB takes evidence under oath.  *Id.* § 23.6 at 289.  If the ARB

12  found an operator contributed to the cause of the accident, an employee may appeal but only to "the

13  extent of the discipline appropriate in the case."  *Id.* § 23.6 at 291; *see id.* Art. 27 at 324.  Union

14  representatives were present at the ARB Hearing and presented on Plaintiff's behalf.

15         Further, two more levels of review were afforded, including a non-binding neutral arbitration.

16  MOU Art. 27 at 326.  While true that the MOU explicitly gave the MTA Executive Director/CEO (or

17  his or her designee) the authority to "exercise [] discretion in accepting, modifying or rejecting the

18  recommended decision" and did not provide an avenue to appeal or challenge a modification of the

19  arbitrator's decision, the Court finds no basis to hold the entire collectively-bargained grievance

20  process "necessarily insufficient to provide sufficient [due] process."  *Id.* at 327; Johnson Dep. (June

21  6, 2012) 87:16–21 (it was not possible under the contract at that time for an employee to grieve a

22  decision to modify the arbitrator's decision); Supp. Opp. at 4.  Plaintiff has not provided evidence of a

23  widespread failure in the process.  Here, the process involves both Union and MTA participation by

24  individuals with experience in the relevant employment area; sworn testimony; opportunity to have

25  representatives present and question witnesses; and the opportunity for transcription.  Plaintiff, as a

26  member of the Union, concedes that she agreed to follow this process.  Molex Decl. ¶ 2 ("I was aware

27  that I had to bring any grievance through the union mechanism.").  No evidence has been presented

28

1    that the Union representatives who participated on Plaintiff's behalf believed that the process itself

2    failed to provide adequate review.

3           To the extent Plaintiff now belatedly suggests that her due process rights were violated

4    because the ARB Hearing was not heard on a timely basis (within twenty business days per the MOU

5    per section 23.6 at 286), there is insufficient evidence in the record to raise that inference.[11]  Neither

6    party has identified specific evidence regarding a time waiver (or failure to obtain a waiver).  In and

7    of itself, the "failure to follow state or local regulations or policies does not ordinarily establish a

8    violation of an individual's right to procedural due process."  *Doe v. Mercer Island Sch. Dist. No. 400*,

9    No. C06-395, 2007 WL 215858, at *4 (W.D. Wash. Jan. 26, 2007) (addressing claim for violation of

10   due process based on defendants' failure to follow expulsion procedures outlined in Washington

11   Administrative Code and district's own policies, where student has state-created property interest in

12   attending public school).  While "due process requirements apply only to liberty and property

13   interests," it does not necessarily follow that a plaintiff has a "protected property interest in the

14   procedures established."  *Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984) (plaintiff alleged

15   deprivation of due process based on procedures established for making decisions regarding promotion

16   and tenure, as set out in the faculty code and school policy statements).  Here, the facts show the

17   brake report was dated after the expiration of the 20-day period and considered by the ARB.

18   *Goodisman*, 724 F.2d at 821; *Doe*, 2007 WL 215858, at *4 (court must examine the process actually

19   provided to plaintiff to determine effect of contravening own policy); Petersen Decl. ¶¶ 5–6 & Ex. A;

20   K. Johnson Dep. 57:12–23.  Further, as Plaintiff herself testified, she was represented by the Union at

21   the ARB Hearing and the representatives went over "every little detail, step by step, of . . . everything

22   that happened, and if what [Molex] did was what [she] was supposed to do or not," including drawing

23   details of the incident on a white board.  Molex Dep. (Vol. II, Sept. 2, 2010) 257:23–258:8, 260:9–12

24   & 260:24–261:4.  Because the Union's ability to represent Plaintiff was not prejudiced, and

25

26

27   [11] As set forth above, ARB Hearing member Paul Petersen testified that the twenty-day timing was "rarely adhered to" and that while he did not know if—in Plaintiff's case—the Union waived the twenty days, any

28   waiver would have been agreed upon between "the union and management.  She would not be involved in it." Petersen Dep. 80:10–81:10.

United States District Court

Northern District of California

1   apparently additional probative information was considered by the ARB, the Court finds that the short

2   delay (even if not waived) does not rise to the level of a constitutional deprivation of due process.

3          Plaintiff's last attempt is to argue that Johnson had additional opinion evidence regarding

4   Plaintiff's failure to follow the distance-rule and that certain evidence was withheld throughout the

5   grievance process.  Supp. Opp. at 5.  With respect to Johnson's "eyewitness" opinion, Plaintiff has

6   failed to link Johnson's opinion to the comprehensive review process, to the ultimate decision, or to

7   the zero-tolerance approach for dealing with these kinds of serious accidents.  The Court finds no

8   evidence to infer that Johnson influenced: Britt when she initially recommended dismissal; Lum when

9   he concurred; the 3-member ARB panel when it found the accident "Avoidable;" Helms who affirmed

10  by denying the grievance; or Cohn when he conducted the non-binding arbitration.  While Johnson

11  reviewed the Non-Binding Arbitration Decision, the decision has already been made and affirmed

12  without her involvement.  The "evidence" was not exculpatory, but rather consistent with all of the

13  lower level findings.  Even the Non-Binding Arbitration Decision was **not** based upon a finding that

14  Johnson *did not cause* the accident or that the evidence showed the brakes *were* defective.  Rather,

15  Cohn's recommendation was based upon his belief that Johnson should be given a second opportunity

16  *despite* the seriousness of the accident, and especially in light of her remorse.  SFMTA disagreed and

17  the MOU authorized disciplinary action based on "severe" accidents.  MOU § 23.6 at 282–84 &

18  Appendix F.  This disagreement does not create an inference of a due process violation.[12]

19         Based on the evidence presented, Plaintiff has failed to identify a written policy or long-

20  standing practice or custom which results in due process violations.  While Plaintiff has raised a few

21

_____

22  [12] Plaintiff also contends that Defendant did not produce a copy of a call from Central Control on the day of the
    Incident (informing her that she was following too closely) and withheld evidence regarding the braking

23  system.  Opp. at 6.  Again, she fails to present evidence that this meaningfully deprived her of due process.
    Plaintiff raised each substantive issue at the various steps in the Skelly, ARB, and grievance processes.  The

24  call from Central Control would not have been exculpatory to Plaintiff and would have provided an additional
    reason to support her termination consistent with what the hearing officers had found.  Plaintiff also testified

25  that she *told* Lum that she never received the call.  Molex Dep. (Vol. II, Sept. 2, 2010) 291:9–12.  Lum noted in
    the Skelly Decision that Plaintiff informed him of this, and *nonetheless* decided that she had violated the

26  spacing rule.  Lum Decl., Ex. B.  Moreover, Plaintiff takes issue with the fact that, in the course of testing the
    brakes, the brake lines had ruptured but that this specific fact was never mentioned at the Skelly hearing.  Reply

27  SS at no. 74.  This ignores that the actual brake report was not dated until after the Skelly hearing, presumably
    to be considered by the ARB.  Further, the actual probative value of that fact is pure speculation at this juncture

28  and on this record.

1   issues regarding the process, none of them rise to the level of constitutional violations.  The process

2   may not have been perfect, but given the record before the Court, it does not find even an inference

3   that the process was *constitutionally*-flawed.  For the reasons stated above, Plaintiff has failed to

4   establish that a legally cognizable policy under this prong of *Monell*.

### 2.    *Monell* Liability Based On Actions By Final Policy-Making Authority

6       Next, the Court considers whether *Monell* liability can be established because the employee

7   "committ[ing] the constitutional tort was an official with 'final policy-making authority.'" *Gillette*,

8   979 F.2d at 1346.  Courts have held that "final policy-making authority" may be interpreted as

9   authority for a single decision.  *Gillette*, 979 F.2d at 1347; *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir.

10  2004) ("policy" includes a course of action tailored to a particular situation whether or not it is

11  "intended to control decisions in later situations") (quoting *Pembaur v. City of Cincinnati*, 475 U.S.

12  469, 481 (1986)).

13      Defendants argue at great lengths that the Civil Service Commission is the "final policy-

14  making authority" for the City and County of San Francisco and therefore *Monell* liability cannot

15  attach to the ultimate termination decision.  Plaintiff counters that "Ford is the final policymaker with

16  respect to MUNI's discipline of employees because his decisions are final and unreviewable."  Supp.

17  Opp. at 5 & n.5.   Plaintiff's position necessarily focuses solely on Ford's authority for "accepting,

18  modifying, or rejecting" non-binding arbitration decisions under the MOU for grievances based on

19  employee discipline.  Plaintiff does not argue that Ford's authority is broad-based.  Supp. Opp. at 5.

20      To determine whether an official is a final policymaker, the court must first "identify the

21  particular area or issue for which the official is alleged to be the final policymaker." *Zografos*, 2006

22  WL 3699552, at *16 (quoting *Cortez v. County of Los Angeles*, 294 F.3d 1186, 1189 (9th Cir. 2002));

23  *see Lytle*, 382 F.3d at 983 (court's inquiry regarding final policymaking authority focused on

24  "employment-related disciplinary decisions for District employees").  The court must then analyze

25  state law to determine the character of an official's function. *Zografos*, 2006 WL 369952, at *16

26  (whether an official is a final policymaker is a matter of law to be determined by the judge rather than

27  the jury with reference to state law).  "[U]nder California law, a city's Charter determines municipal

28

United States District Court

Northern District of California

affairs such as personnel matters."  *Ulrich*, 308 F.3d at 985 (quoting *Hyland v. Wonder*, 117 F.3d 405, 414 (9th Cir. 1997) (alteration in original); *Zografos*, 2006 WL 369952, at *16 (a city's charter determines whether an official is a final policymaker).

Defendant argues that the CSC is the final policymaker with respect to employment matters. Supp. Reply at 4.  Defendant is correct that under the Charter of the City and County of San Francisco ("Charter"), the CSC is generally the "final policymaker with respect to employment matters."  *Schiff v. City and County of San Francisco*, 816 F. Supp. 2d 798, 812–13 (N.D. Cal. 2011); *Harris v. City and County of San Francisco*, No. C 08-2353 PJH, 2009 WL 2421732, at *14 (N.D. Cal. Aug. 6, 2009) (same).  Specifically, the CSC "is charged with the duty of providing qualified persons for appointment to the service of the City and County."  Charter § 10.100; *Schiff*, 816 F. Supp. 2d at 804 (CSC sets forth the competitive examination "process for making entry level and promotional appointments in the City").  As part of its general powers and duties, the CSC "shall adopt rules, policies and procedures to carry out the civil service merit systems" to govern a specific list of employment matters.  Charter § 10.101.  While this section of the Charter does specify a wide and seemingly-broad range of employment matters within the CSC's powers, conspicuously absent from this list is a reference to the termination, discharge, or dismissal of employees.[13]  This absence is particularly relevant in light of the agreed-upon MOU which explicitly provided Ford or his "designee" with the discretion to accept, modify, or reject Step 4 non-binding arbitration decisions. MOU Art. 27 at 327.  Johnson herself confirmed that Ford's decisions to modify were not grievable. Johnson Dep. (June 6, 2012) 87:16–21.

---

[13] The CSC's "rules shall govern applications; examinations; eligibility; duration of eligible lists; certification of eligibles; leaves of absence for employees and officers; appointments; promotions; transfers; resignations; lay-offs or reduction in force, both permanent and temporary, due to lack of work or funds, retrenchment or completion of work; the designation and filling of positions, as exempt, temporary, provisional, part-time, seasonal or permanent; status and status rights; probationary status and the administration of probationary periods, except duration; pre-employment and fitness for duty medical examinations, except for the conditions under which referrals for fitness for duty examinations will be made, and the imposition of new requirements; classification; conflict of interest; and such other matters as are not in conflict with this Charter."  Charter § 10.101.

United States District Court

Northern District of California

Plaintiff counters arguing that the CSC only reviewed Plaintiff's challenge to her future employment restrictions.  Defendant provides no evidence to rebut the specific premise that for purposes of termination decisions arising from the MOU, Ford's termination decisions were indeed final.  While Ford and the MTA, generally speaking, may have been "constrained by the CSC rules and policies in making [his/its] decisions" (Supp. Reply at 1), this general principle does not supplant the more specific authority vested in Ford through the MOU.  Defendant's communications to Plaintiff confirm this view.  Plaintiff's Notice of Separation from Employment clearly stated that she "may request a hearing before the Civil Service Commission on your future employability with the civil service system" and that the CSC "has the authority to remove restrictions . . . on your future employability."  Johnson Decl., Ex. B.  This Notice also explicitly stated: "[h]owever, the Commission <u>CANNOT</u> reverse the department's decision to terminate your employment."  *Id.* (emphasis in original).[14]  *Zografos*, 2006 WL 3699552, at *16 ("The authority to exercise discretion while performing certain functions does not make the official a final policymaker unless the decisions are final, unreviewable, and not constrained by the official policies of supervisors.") (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126–28 (1988)); Supp. Opp. at 3.[15]

---

[14] This conclusion is confirmed by another portion of the Charter, which "placed within Municipal Transportation Agency the power and duties relating to transit" that had been previously vested within other departments, boards, and commissions of the City and County.  Charter § 8A.100(d).  The Charter "intended to ensure sufficient oversight of the [MTA]" and to "preserv[e] the role of . . . the Civil Service Commission[] as to merit system issues."  *Id.* § 8A.100(e).  But at the same time, the Charter "intended to strengthen the [MTA's] authority to: 1) manage its employees; . . . [and] 3) protect the *Agency's right* to select, train, promote, demote, *discipline*, layoff and *terminate employees*, managers, and supervisors based upon the highest standards of customer service, efficiency, and competency."  *Id.* § 8A.100(f) (emphasis supplied.)

[15] The Charter further provides that: "[e]xcept as otherwise provided in this Section, the Agency shall be governed by the rules of the civil service system administered by the City and appeals provided in civil service rules shall be heard by the City's Civil Service Commission.  Unless otherwise agreed by the Agency and affected employee organizations, appeals to the Civil Service Commission shall include only those matters within the jurisdiction of the Civil Service Commission which establish, implement, and regulate the civil service merit system as listed in Section A8.409-3."  Charter § 8A.104(b).  There is no such agreement in the MOU altering the fact that appeals to the CSC shall include only those matters within its jurisdiction.  Further, while the City and County is required to bargain in good faith with employee organizations regarding the "establishment of procedures for the resolution of grievances concerning the interpretation or application of any agreement, and including agreements to provide binding arbitration of discipline and discharge," the Charter expressly retained its ability to establish, implement, and regulate the civil merit system.  *Id.* § 8A.409-3.  It did not reference termination decisions as a matter within the jurisdiction of the CSC.

Based on the foregoing, the Court finds that Ford is in fact the final policy-making authority for termination decisions arising out of the MOU at issue here.  However, because Plaintiff does not argue that Ford himself committed the constitutional violation, other than to ratify Johnson's actions or delegate authority to her (Supp. Opp. at 5), Plaintiff cannot state a claim under the second test.

### 3.        Delegation and Ratification

Finally, the Court turns to whether a *Monell* claim can be stated where the final decision-maker delegated decision-making authority to a subordinate or ratified the unconstitutional basis of a subordinate's decision.  The crux of Plaintiff's argument is that Debra Johnson's "single act [of] overturning the arbitrator's decision" violated plaintiff's constitutional rights and constituted policy because "she was acting with the authority of the final policymaker."  Supp. Opp. at 5.

With respect to delegation, "courts consider whether the [subordinate's] discretionary decision is constrained by policies not of that [person's] making and whether [his or her] decision is subject to review by the municipality's authorized policymakers."  *Schiff*, 816 F. Supp. 2d at 813 (quoting *Christie*, 176 F.3d at 1236–37); *Ulrich*, 308 F.3d at 986 (also quoting *Christie*).  Importantly, the ability to delegate discretion does not require contemporaneous delegation of final policymaking authority.  *Schiff*, 816 F. Supp. 2d at 813 (delegating discretion is not equivalent to delegating final policymaking authority).   In analyzing ratification, the Ninth Circuit has concluded that the mere deferential review of a subordinate's discretionary decision is insufficient for *Monell* liability.  *Gillette*, 979 F.2d at 1347–48.  Following *City of St. Louis v. Praprotnik*, the *Gillette* court held that in order for a policymaker to be deemed to have ratified a subordinate's decision, the policymaker must "approve the subordinate's decision *and the basis for it*."  *Gillette*, 979 F.2d at 1348 (emphasis in original).  The *Gillette* court did note the Supreme Court's distinction that with delegation a different result may occur "if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker . . . [or] if a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware."  *Gillette*, 979 F.2d at 1348 (quoting *Praprotnik*, 485 U.S. at 130) (alterations in original).

Other Ninth Circuit cases have similarly held that "[t]he policymaker must have knowledge of the constitutional violation and actually approve it."  *Lytle*, 382 F.3d at 987 (failure to overrule a

United States District Court

Northern District of California

subordinate's actions, without more, is insufficient); *Christie*, 176 F.3d at 1239 ("A policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification. Instead, a plaintiff must prove that the policymaker approved of the subordinate's act. For example, it is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval."). Ratification is ordinarily a question for the jury, although the plaintiff must establish there is a genuine issue of material fact regarding whether a ratification occurred. *Christie*, 176 F.3d at 1238–39 (affirming grant of summary judgment against a plaintiff who did not establish whether a County Prosecutor ratified the actions of a deputy prosecutor).

Plaintiff offers the following evidence to show delegation: (1) Ford had authority to "designate" the responsibility of modifying arbitration decisions to another; (2) Ford delegated that authority to Johnson on at least two occasions; and (3) Johnson signed her name "for" Ford on the dismissal letter. Supp. Opp. at 5. Defendant counters that the evidence shows that it was Johnson's responsibility to review disciplinary recommendations regarding MTA employees and to recommend to Ford whether decisions should be "accepted, modified, or rejected." The Court agrees with Defendant.

It is undisputed that Johnson made the initial review and thereafter submitted recommendations to Ford. Johnson Decl. ¶¶ 5 & 10; Johnson Dep. 20:16–21:19. Johnson's use of the word "designated" or "designee" in a deposition and signing of the dismissal letter "for" Ford do not create, taken together, a triable issue of fact on the issue. *See* Johnson Dep. (Jan. 25, 2011) 50:23–51:6; Johnson Dep. (June 6, 2012) 83:15–20; Johnson Decl. ¶¶ 5, 10–11; Ford Decl. ¶¶ 4 & 6; *see* Reply SS at nos. 36–39 (Plaintiff's only "evidence" to dispute that Johnson recommendation and Ford approved is the letter itself and Johnson's testimony that she signed the letter and called herself his designee). Further, of the five instances from 2008 to 2010 where Ford modified an arbitration decision, he did so three of five times *without* Johnson's involvement. Nothing in the record shows that Johnson ever acting without Ford's review.   Accordingly, the Court must find that any discretionary decision Johnson made was "subject to review by" Ford and "constrained" by him. *See Ulrich*, 308 F.3d at 986 (delegated authority can be shown where the decisions "were not subject to review by the Governing Board"); *Harman v. City and County of San Francisco*, 136 Cal. App. 4th

1   1279, 1300 (Cal. Ct. App. 2006) (effective delegation had been made where particular employee's

2   approval was required for all appointments and she "performed a policymaking role in reviewing

3   departmental diversity staffing plans").   Accordingly, Plaintiff cannot establish that Johnson had been

4   delegated final policymaking authority for the purposes of *Monell*.

5          The Court now turns to the final theory upon which *Monell* liability can be based: ratification.

6   The question is whether Ford ratified the allegedly *unconstitutional basis* for Johnson's

7   recommendation—not necessarily the recommendation itself.  *Gillette*, 979 F.2d at 1348.  Plaintiff

8   argues that her due process rights were violated because Johnson "considered evidence never

9   produced at Plaintiff's due process hearings, and evidence and facts were withheld from Plaintiff

10  throughout the grievance process."  Supp. Opp. at 5.

11         Plaintiff has not presented any evidence that Ford considered these facts or that Johnson ever

12  shared the information that she (Johnson) saw Plaintiff driving too closely on that day.  Ford Decl. ¶¶

13  4, 6–7; Johnson Decl. ¶ 12.  Johnson herself denies sharing the information with Ford.  Reply SS at

14  no. 53 ("Johnson did not tell Ford that she had seen Molex driving too closely . . . on the day of the

15  accident and Ford did not consider this evidence in making his decision.").  Further, Plaintiff herself

16  conceded this position by arguing that Ford had *no role* in the decision: "Ford did not terminate

17  Molex, Ms. Johnson did.  It is her signature on the termination papers.  Nathaniel Ford accepted every

18  single recommendation by Johnson."  *Id.*  Plaintiff's evidence is directed to the ultimate issue of

19  terminating, *not to* the underlying factual basis of this *constitutional* claim.  Johnson's

20  recommendation to terminate Plaintiff was consistent with four other internal evaluations:  the first by

21  Britt, the Acting Superintendent of Plaintiff's Division; the second by Lum after a Skelly hearing; the

22  third by the Accident Review Board; and the fourth by Helms at the Step 3 grievance.  Further, the

23  arbitrator did not voice any disagreement with the facts regarding the Incident.

24         Having failed to set forth any evidence that Ford ratified the alleged unconstitutional act by

25  Johnson or from which the same can be inferred, Plaintiff has not established a triable issue of fact

26  that *Monell* liability is viable under this theory.

27

28

**III.    CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**.  This Order terminates Dkt. Nos. 40 & 47.  Defendant shall prepare a Form of Judgment and submit it to the Court after providing Plaintiff with an opportunity to approve as to form.

All trial-related dates are hereby **VACATED**.

**IT IS SO ORDERED.**

Dated: July 25, 2012

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court

Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28